[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-12095

_____

ISAAC INDUSTRIES, INC.,

Plaintiff-Appellee,

*versus*

PETROQUÍMICA DE VENEZUELA, S.A.
BARIVEN S.A.,

Defendants-Appellants,

PDVSA SERVICES, B.V., et al.,

Defendants.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:19-cv-23113-RNS

_____

Before WILLIAM PRYOR, Chief Judge, JORDAN and MARCUS, Circuit
Judges.

WILLIAM PRYOR, Chief Judge:

This appeal requires us to decide issues related to personal
jurisdiction, foreign sovereign immunity, and the merits of a com-
plaint for breach of contract. Isaac Industries contracted with
Bariven, S.A., a Venezuelan oil company, for the sale of chemicals.
After Isaac shipped the products, Bariven failed to pay for them.
Later, Petroquímica de Venezuela, S.A., another oil company, as-
sumed Bariven's debt and negotiated an extended payment period.
When that company made only the first payment, Isaac sued both
companies in the district court. The oil companies initially raised
objections about service of process and sovereign immunity. A
magistrate judge concluded that effective service occurred but rec-
ommended denying Isaac's motion for default and ordering it to
amend its complaint. The oil companies raised no objection and
answered the amended complaint. When Isaac later moved for
summary judgment, the oil companies hired new counsel, argued
that no valid contracts exist and that sovereign immunity shields
Pequiven from suit, and urged the district court to defer ruling. The
district court granted summary judgment for Isaac. No reversible
error occurred. We affirm.

## I. BACKGROUND

Two interwoven plots—Isaac's sale of chemicals to the Venezuelan oil companies and the political upheaval in Venezuela—set the stage for this appeal, so we begin with them. We then turn to the procedural history of the lawsuit.

### A. Isaac Industries Sells Chemicals to Bariven But Never Receives Full Payment.

This action involves four entities, one American company and three Venezuelan companies. Isaac Industries is a Florida corporation engaged in the wholesale distribution of chemicals. Its owner, David Avan, runs the company from Miami. Petroleos de Venezuela, S.A., Petroquímica de Venezuela, S.A., and Bariven, S.A. are oil and chemical companies associated with or owned by the Bolivarian Republic of Venezuela. Petroleos de Venezuela, known as PDVSA, serves as Venezuela's state-owned and controlled oil company. Bariven, a "wholly owned subsidiary of . . . PDVSA," acquires the equipment and machinery used to find and extract oil. And Petroquímica de Venezuela, known as Pequiven, operates as a "petrochemical company engaged in the production and sale of" products like "fertilizers, industrial chemical products, olefins, and plastic resins."

According to Avan, Isaac contracted with Bariven for the sale and delivery of 2-Ethylhexanol in 2014. Under the contract, Bariven would order the quantity it required at a unit price of $2,975.00 per metric ton. Isaac would then ship the product to Vopak Terminal in Puerto Cabello, Venezuela. Between July and September 2014,

Bariven placed three orders for a total of 5,993.873 metric tons of 2-Ethylhexanol.

After it shipped each order, Isaac provided Bariven with an invoice. The first two invoices, both dated July 6, 2014, charged Bariven $5,950,000.00 for one shipment and $5,941,928.83 for the other. The third invoice, dated September 19, 2014, charged Bariven $5,939,843.35. All three listed Bariven and PDVSA as the buyers and Pequiven as the consignee. Although Bariven never objected to the invoices, it never paid for the shipments.

After two years passed without payment from Bariven, representatives of Pequiven asked Avan to meet about the "the current status" of the debt. Avan agreed. Negotiations took place on September 21, 2016, in Miami. Saul Silva, Pequiven's legal counsel, represented the oil company. During the negotiations, Avan discussed the "monies owed to Isaac by Bariven . . . at length." By the meeting's end, "Pequiven . . . voluntarily undertook the obligation to make the payments" Bariven owed.

A written contract memorialized the agreement. Silva signed on Pequiven's behalf. The contract began with a reference to a prior "payment contract with subrogation of debt signed between Bariven[,] S.A., PDVSA Services B.V., Pequiven, and ISAAC INDUSTRIES INC." It then described the terms of the newest repayment plan: that Pequiven agreed to pay the outstanding balance in exchange for Isaac's release of Bariven's debt. The payment structure applied an annual interest rate to the $17,831,772.18 principal amount. And Pequiven promised to pay 15 percent of the

debt, plus interest, by December 31, 2016, followed by six quarterly installment payments. In turn, Isaac's release of Bariven's debt required Pequiven's full payment. Absent that payment, Bariven remained responsible for the outstanding balance.

Pequiven met the first deadline but no others. Consistent with the written agreement, it tendered a payment of $2,947,542.00 (15 percent of the debt plus interest) on December 30, 2016. Neither Pequiven nor Bariven tendered the six remaining installments.

Two years later, the corporate governance of the oil companies splintered when Nicolás Maduro declared himself the winner of Venezuela's presidential election. In protest, Venezuela's National Assembly declared Maduro's regime illegitimate and recognized Juan Gerardo Guaidó Márquez, the president of the National Assembly, as interim president in January 2019. The United States immediately affirmed the 2015 National Assembly as the legitimate government. But Maduro refused to cede control and blocked Guaidó from power.

State-owned entities—like the oil companies—were caught in the middle of the dueling regimes. In 2019, the National Assembly granted Interim President Guaidó the power to appoint ad-hoc boards to govern state entities. Interim President Guaidó, in turn, appointed an ad-hoc board to govern PDVSA—a board that also "safeguard[s] Bariven's interests" abroad—and an ad-hoc board to govern Pequiven.

Maduro refused to recognize these ad-hoc boards. His regime occupied the oil companies' Venezuelan offices. And it declared the ad-hoc board members "criminals" for their "usurping [of] public functions." Today, the members of the ad-hoc boards "reside outside [of] Venezuela" and risk "arrest" if they return. The United States, for its part, continues to recognize the 2015 National Assembly "as the last remaining democratic institution in Venezuela."

### B. Isaac Sues the Oil Companies
### for Breach of Contract.

Isaac sued Pequiven, Bariven, and PDVSA for breach of contract in July 2019. Although filing the complaint proved easy, effecting service on the oil companies was another matter. Within a month of filing the lawsuit, Isaac hired an international process service to "effectuate service . . . under the Hague [Service] Convention." On September 10, 2019, the process server confirmed that Venezuela's Central Authority received the process documents. Silence followed. The Central Authority never confirmed that it executed service to the oil companies or certified receipt of service, as required by the Hague Service Convention. *See* Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters arts. 2–6, *opened for signature* Nov. 15, 1965, 20 U.S.T. 361, 362–63.

The battle over service escalated near the one-year anniversary of the action. Citing its "unsuccessful" attempts to serve the defendants by the Central Authority, Isaac moved to permit

alternate service. After the district court granted the motion, the oil companies began to participate in the litigation in earnest.

Each oil company moved to dismiss the action on two relevant bases. First, each company argued that it qualified as an "instrumentality of a foreign state" under the Foreign Sovereign Immunities Act, which made alternative service improper. Second, each company maintained that the district court lacked authority to hear the suit because Isaac's "[c]omplaint [was] completely devoid of any allegations" that the companies fell "within one of the [Sovereign Immunities Act's] enumerated exceptions to immunity." The district court granted the motions to dismiss "based [on] insufficiency of service of process," gave Isaac additional time to complete service, and affirmed the oil companies' ability to "reassert the remaining bases for dismissal."

After more time passed with no response from Venezuela's Central Authority, Isaac cited Article 15 of the Hague Service Convention and moved for an entry of default against the oil companies under Federal Rule of Civil Procedure 55(a). Article 15 permits a judge to enter a default judgment "even if no certificate of service or delivery has been received" so long as a plaintiff "transmitted" the service documents "by one of the methods" described in the Convention, "six months . . . has elapsed," and "no certificate of any kind has been received, even though every reasonable effort has been made to obtain it." Hague Service Convention, *supra*, 20 U.S.T. at 364. Isaac argued that its attempt to serve process satisfied each of the three conditions: it effectuated service under the

Convention; nearly two years had passed; and the Central Authority "ha[d] refused to return the required certificate of service."

In a report and recommendation, the magistrate judge agreed that Isaac met "all three requirements" of Article 15. Nevertheless, the magistrate judge recommended that the district court "exercise its discretion" to deny Isaac's "request for a default" because the oil companies appeared early in the case, contested service of process, and filed meritorious motions to dismiss. The magistrate judge gave the parties 14 days to file written objections to its report and recommendation and cautioned that "[f]ailure to file objections . . . shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this [r]eport." Despite this warning, the oil companies filed no objections.

The district court adopted the report and recommendation. It denied Isaac's motion for entry of a default, dismissed the complaint without prejudice, and ordered Isaac to file an amended complaint that "properly assert[ed]" that the oil companies satisfied an exception to immunity under the Sovereign Immunities Act. It also prohibited the oil companies from "re-asserting a challenge to service of process."

In compliance with that order, Isaac filed an amended complaint. This time, it alleged that the companies satisfied the commercial-activity exception to immunity under the Act. In response, only PDVSA moved to dismiss based on sovereign immunity, and the district court later dismissed the claims against that entity.

Pequiven, in contrast, responded that Isaac failed to "allege that Pequiven received any consideration for its purported assumption of debt." Both Pequiven's and Bariven's answers to the amended complaint stated that the allegations about the commercial-activity exception required no response because they called for a "legal conclusion." And neither oil company challenged service of process.

After Isaac served various discovery requests, the oil companies admitted little and provided nothing in response. The presidents of Pequiven's and PDVSA's ad-hoc boards filed affidavits that attested that the oil companies could not "identify any individual[s] competent to testify" as their corporate representatives. Nor did they "have possession, custody or control of documents" relevant to the proceedings because the Maduro regime maintained "complete possession and control of all such information" and occupied their Venezuelan offices. These facts made any effort to "collect information" for production impossible.

When Isaac eventually moved for summary judgment, the oil companies rolled out new counsel, new legal positions, and new evidence. They filed a declaration from Jesus Bellorin, the new administrator of Pequiven, and a copy of Pequiven's bylaws—both submitted after the close of discovery. Pequiven sought to use that new evidence to resurrect its sovereign-immunity argument. It argued that the bylaws established that Silva, Pequiven's purported general counsel, lacked authority to negotiate and sign the contract on its behalf. And it asserted that the contract with Isaac was invalid

for lack of consideration. Without an official "act" or valid contract, Pequiven argued that Isaac could not establish the commercial-activity exception to sovereign immunity. As for Bariven, the oil companies invoked the Florida statute of frauds to argue that Isaac failed to prove that a valid contract existed.

The oil companies also asked the district court to "deny or defer consideration" of Isaac's motion for summary judgment under Federal Rule of Civil Procedure 56(d). With the "minimal" "discovery record," the oil companies contended that the "interests of justice . . . require[d] postponement." In their view, Isaac's motion asked the district court to rule in its favor "without ever allowing Defendants to identify evidence in its own records to support a full defense."

Isaac moved to strike Bellorin's declaration and Pequiven's bylaws under Federal Rules of Civil Procedure 26 and 37. It argued that the new evidence amounted to "sandbagging" because Pequiven "hadn't pled lack of authority as an affirmative defense and had answered a request for admission by stating it was 'without knowledge' regarding Silva's authority." The parties also filed a pretrial stipulation which stated for the first time that Bariven was not an agency or instrumentality of Venezuela.

The district court granted Isaac's motion for summary judgment for breach of contract. The district court ruled that Pequiven implicitly waived sovereign immunity when it failed to assert it in its answer and that, in any event, Isaac satisfied the commercial-

activity exception. It also chastised Pequiven for complaining about Isaac's thin factual record when it had failed to produce "contrary evidence" of its own. The district court ruled that the bylaws "were [not] properly before" it. Then it concluded that, even if they were, the bylaws would not change the outcome because they authorized "the delegation of authority . . . to allow for others," like Silva, "to execute contracts." And the district court then ruled that the undisputed material facts established that Pequiven and Bariven breached their contracts with Isaac.

The district court also refused to delay or defer its ruling under Rule 56(d). It explained that the oil companies "declined to depose Isaac's witness or otherwise proactively participate in the discovery process." They also failed to "identify a single piece of documentary or testimonial evidence that they believe might actually controvert Isaac's showing or help their case."

The final judgment assessed the damages owed by the oil companies. The total balance owed by Pequiven—inclusive of the principal plus interest—amounted to $23,384,373.00. The total balance owed by Bariven amounted to $15,111,440.00, plus interest. The district court held the oil companies jointly and severally liable for the principal amount of $15,111,440.00. Bariven owed prejudgment interest of $307,155.66 plus postjudgment interest. And Pequiven owed the additional amount of $8,272,933.00 plus postjudgment interest.

## II. STANDARDS OF REVIEW

Two standards govern our review. We review *de novo* questions of law about service of process. *See Prewitt Enters. v. OPEC*, 353 F.3d 916, 920 (11th Cir. 2003). We review *de novo* whether a defendant enjoys immunity under the Sovereign Immunities Act. *R&R Int'l Consulting LLC v. Banco do Brasil, S.A.*, 981 F.3d 1239, 1243 (11th Cir. 2020). And we review *de novo* a summary judgment. *See Tillis ex rel. Wuenschel v. Brown*, 12 F.4th 1291, 1296 (11th Cir. 2021). We draw all reasonable inferences for the oil companies and view the evidence in the light most favorable to them. *Black v. Wigington*, 811 F.3d 1259, 1265 (11th Cir. 2016). We review the denial of a motion under Rule 56(d) for abuse of discretion. *Burns v. Town of Palm Beach*, 999 F.3d 1317, 1330 (11th Cir. 2021).

## III. DISCUSSION

We divide our discussion in five parts. First, we explain that the oil companies waived their challenge to personal jurisdiction when they failed to object to the magistrate judge's report and recommendation and then omitted any reference to insufficient service of process in their answers to the amended complaint. Second, we explain that Pequiven waived sovereign immunity when it failed to raise sovereign immunity in either its answer or its motion to dismiss the amended complaint. Third, we explain that the record presents no genuine issue of fact that Pequiven breached its contract with Isaac. Fourth, we explain that the record also presents no genuine issue that Bariven too breached its contract.

Finally, we explain that the district court did not abuse its discretion when it denied the oil companies' motion under Rule 56(d).

### A. The Oil Companies Waived Their Challenge to Personal Jurisdiction.

The oil companies contend that, without proper service, the judgment against them is void for lack of personal jurisdiction. Isaac responds that the oil companies waived their challenge when they failed to object to the magistrate judge's final report and recommendation. We agree that the oil companies waived their challenge.

Settled rules govern our inquiry. Under our precedent, a party who fails "to file objections to a magistrate judge's order in a non-dispositive matter to the district court waives that claim on appeal." *A.L. ex rel. D.L. v. Walt Disney Parks & Resorts U.S., Inc.*, 50 F.4th 1097, 1112 (11th Cir. 2022). Our rules reinforce this conclusion. *See* 11TH CIR. R. 3-1 ("A party failing to object to a magistrate judge's findings or recommendations . . . waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object."). And we have long warned defendants that they "waive[] any objection to the district court's jurisdiction over [their] person[s]" when they fail to "object[] to it in a responsive pleading or a [Rule] 12 motion." *Palmer v. Braun*, 376 F.3d 1254, 1259 (11th Cir. 2004). So, if a defendant fails to challenge a "defect in personal jurisdiction" in his answer to the operating complaint, he "consent[s]

to the court's jurisdiction." *Pardazi v. Cullman Med. Ctr.*, 896 F.2d 1313, 1317 (11th Cir. 1990). And once he "consent[s] to litigate the action in [our] court, [we] may not . . . dismiss the suit for lack of personal jurisdiction or insufficient service of process." *Id.*

Under these tenets of civil procedure, the oil companies waived their objection to personal jurisdiction twice over. They first waived the challenge when they failed to object to the magistrate judge's report and recommendation on Isaac's motion for an entry of default under Rule 55(a). The report and recommendation advised the oil companies that this failure would bar them "from attacking on appeal . . . legal conclusions contained in this [r]eport." Despite this warning, the oil companies chose not to respond. And the district court then adopted the report and recommendation. This failure alone is enough to waive a challenge to insufficient service of process. *See Walt Disney Parks*, 50 F.4th at 1112. And the oil companies' second waiver, which occurred when they later filed answers to the amended complaint that omitted any reference to service of process, reinforces our conclusion that they abandoned this challenge and "consented" to the exercise of jurisdiction over them. *Pardazi*, 896 F.2d at 1317.

The oil companies' counterarguments fail to convince us otherwise. They first contend that "it is unclear as to what [they] could have even objected" because the magistrate judge held "that service had not been effected under the Hague [Service] Convention." This argument misleads through half-truth. To be sure, the magistrate judge concluded that Isaac never perfected service

under the Convention. But the magistrate judge also concluded that Isaac satisfied its obligations under the Convention because it met the three conditions for a default judgment under Article 15.

The oil companies could have raised several objections to the magistrate judge's recommendation—including the same ones they raise here. They could have argued that Isaac did not satisfy the three conditions of Article 15. They could have argued that the Sovereign Immunities Act required Isaac to attempt service through alternative methods. And they could have objected to the magistrate judge's recommended prohibition on additional challenges to service of process. But they chose not to press these arguments, and we refuse to entertain them now.

The oil companies next argue that even if they waived this challenge, we should still review it for "plain error . . . in the interests of justice." We decline their invitation. The oil companies made a strategic choice when they declined to object to the report and recommendation or to object to personal jurisdiction in their answers. Instead of risking that Isaac would next move for, and perhaps obtain, a default judgment, the oil companies chose to defend the action on the merits. No "interest of justice" obliges us to consider their waived challenge to personal jurisdiction now that they lost on the merits of the claims for breach of contract.

### B. Pequiven Waived Its Sovereign-Immunity Challenge.

Pequiven argues that the Sovereign Immunities Act shields it from this suit on two fronts. First, it asserts that it did not waive

its sovereign-immunity challenge. Second, it argues that the commercial-activity exception to sovereign immunity does not apply. Because we decide its appeal on the first front, we do not reach the second.

The Sovereign Immunities Act provides the "sole basis for obtaining jurisdiction over a foreign state." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989). Under the Act, we presume that a foreign state, along with its "agenc[ies]" and "instrumentalit[ies]," is immune from suit in federal courts. 28 U.S.C. §§ 1603–04. But this presumption falls away when one of the Sovereign Immunities Act's "specified exception[s]" applies. *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993).

This appeal turns on the waiver exception, which provides that a federal court can hear an action "in which the foreign state has waived its immunity either explicitly or by implication." 28 U.S.C. § 1605(a)(1). "Under the law of the United States, a waiver of immunity"—either explicit or implicit—"may not be withdrawn, except by consent of all parties to whom (or for whose benefit or protection) the waiver was made." RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 456(3) (AM. L. INST. 1987). So "sovereign immunity, once waived, cannot be reasserted." *Aquamar S.A. v. Del Monte Fresh Produce N.A., Inc.*, 179 F.3d 1279, 1287 n.18 (11th Cir. 1999). Our Court, wary of this harsh consequence and "loath to broaden the scope of the implied waiver provision," construes the exception "narrowly." *Id.* at 1291 n.24 (citation and internal quotation marks omitted). But even so, an agency or

instrumentality of a foreign state "reveals its intent to waive its immunity" when it (1) "agree[s] to arbitration in another country," (2) "agree[s] that the law of a particular country should govern a contract," or (3) "file[s] a responsive pleading in an action without raising the defense of sovereign immunity." *Calzadilla v. Banco Latino Internacional*, 413 F.3d 1285, 1287 (11th Cir. 2005).

Pequiven lands squarely within the implied-waiver exception: it filed a "responsive pleading" to Isaac's amended complaint "without raising the defense of sovereign immunity." *Id.* This omission establishes a "clear and unambiguous" intent to waive the defense. *Aquamar*, 179 F.3d at 1292 (citation and internal quotation marks omitted). To be sure, Pequiven moved to dismiss the *original* complaint based on sovereign immunity. But Isaac cured its earlier omission of allegations about an exception to sovereign immunity when it alleged in its *amended* complaint that the commercial-activity exception applied to Pequiven. In response, the oil companies' joint motion to dismiss reasserted a sovereign-immunity defense only for PDVSA. That motion mentioned Pequiven—but argued that the complaint "fail[ed] to state a claim" against the entity because it did not allege that Pequiven "received any consideration for the assumption of debt." Pequiven's answer similarly omitted any assertion that sovereign immunity shielded the company. Instead, it asserted two affirmative defenses: one about the political crisis in Venezuela and one about lack of consideration. Sovereign immunity went unmentioned until Pequiven's new counsel sought to resurrect it in response to the motion for summary judgment.

This litigation conduct established Pequiven's intent to "waive[] its immunity . . . by implication." 28 U.S.C. § 1605(a)(1). After raising a sovereign-immunity challenge in the first round, Pequiven dropped all sovereign-immunity arguments in the second. Unlike PDVSA, it did not move to dismiss the amended complaint on sovereign-immunity grounds. Its answer failed to contest the amended complaint's allegations about the commercial-activity exception. It did not seek discovery. And it decided to take part in the litigation for over a year without even a hint (that is, until new counsel appeared) that sovereign immunity shielded it from federal jurisdiction. Pequiven may regret this course of action, but it must live with the consequences of its litigation tactics.

Pequiven unpersuasively argues that it "asserted the defense throughout the litigation," starting with its original motion to dismiss. But in that motion, Pequiven's single grievance focused only on Isaac's failure to present *any* allegation that Pequiven satisfied any of the sovereign-immunity exceptions. After Isaac amended its complaint, Pequiven had the opportunity to contest the new allegations about the commercial-activity exception but failed to do so.

Pequiven also erroneously relies on an agreed order that granted Pequiven's motion to dismiss and affirmed its "ability to reassert the remaining bases for dismissal contained" in its motion "once service of process [was] effectuated." Pequiven casts that order as one that "preserv[ed] all of [its] defenses." But the text of the order, which preserved Pequiven's ability to "reassert" its sovereign-immunity defense, betrays Pequiven's description. The order

did not preserve in perpetuity a general assertion of sovereign immunity. Instead, it required action that Pequiven declined to take.

Pequiven's remaining argument relies on two out-of-circuit precedents, neither of which support its position. In *Drexel Burnham Lambert Group Inc. v. Committee of Receivers for Galadari*, the Second Circuit declined to find an implicit waiver where the defendant did not plead the immunity defense in its answer but followed that pleading "almost immediately" with a "motion to dismiss that did." 12 F.3d 317, 326 (2d Cir. 1993). And in *Canadian Overseas Ores Ltd. v. Compania de Acero del Pacifico S.A.*, the Second Circuit refused to find an implicit waiver where the defendant never filed an answer, but still asserted the defense of sovereign immunity in a petition for removal, a memorandum in opposition to remand, a stipulation concerning the amended complaint, and a motion to dismiss the amended complaint. 727 F.2d 274, 276–78 (2d Cir. 1984). Unlike the defendants in *Drexel* and *Canadian Overseas*, Pequiven did not assert sovereign immunity in *either* its answer or its motion to dismiss the amended complaint. This omission, in the context of the procedural history before us, establishes a "clear and unambiguous" intent to waive the defense. *See Aquamar*, 179 F.3d at 1292 (citation and internal quotation marks omitted).

Pequiven also maintains that sovereign immunity is not an affirmative defense, and it argues that the burden-shifting framework we have long applied to these issues has been "undermined . . . by recent Supreme Court precedent." At oral argument, Pequiven added that the Supreme Court's recent grant of certiorari

in *Republic of Hungary v. Simon* directly presents the question of which party bears the burden of proof on sovereign immunity. 144 S. Ct. 2680 (2024) (mem.).

The resolution of that issue has no effect on this appeal. Even if a plaintiff bears the ultimate burden of proof on sovereign immunity, a defendant must, at least, raise it in a motion to dismiss *or* contest a complaint's allegations that an exception applies to avoid waiver "by implication." 28 U.S.C. § 1605(a)(1). That is, the burden of proof comes into play only if a defendant contests that the plaintiff has satisfied its burden by pleading and proof. And Pequiven offered no contest by motion, answer, or proof. The closest Pequiven came was a belated declaration and equivocal bylaws offered at summary judgment, both of which were too little, too late. So we leave the burden-of-proof arguments for an appeal that actually presents the issue.

### C. Summary Judgment for Isaac Industries Was Proper as to Pequiven.

Pequiven contends that the district court erred when it granted summary judgment to Isaac on its claim for breach of contract. Pequiven argues that Saul Silva lacked authority to bind it, and, in any event, the contract "was not supported by consideration." But Pequiven waived the lack-of-authority defense when it failed to assert it in its answer, and its argument about consideration fails on the merits.

Whether an agent possesses authority to bind its principal is an affirmative defense that must be pleaded. *See* 5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1271 (4th ed. 2024). "Failure to plead an affirmative defense generally results in a waiver." *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1239 (11th Cir. 2010). And when a defendant raises an affirmative defense in, for example, a motion for summary judgment, we have ruled that its "failure to specifically plead the defense in its answer or amended answer" bars a challenge on appeal. *See Easterwood v. CSX Transp., Inc.*, 933 F.2d 1548, 1551 (11th Cir. 1991).

Pequiven first asserted a lack-of-authority defense in its response to the motion for summary judgment, so it waived the defense in the process. We decline to consider it now.

Waiver aside, Pequiven's lack-of-authority argument fails on the merits. In *GDG Acquisitions LLC v. Government of Belize*, we declined to decide whether Belize's purported agent possessed "actual authority" to enter an agreement because Belize "subsequently ratified his actions and, therefore, agreed to be bound by them" when it made payments in line with the agreement. 849 F.3d 1299, 1308–10 (11th Cir. 2017). That logic applies with equal force here. Even if we assume that Silva lacked actual or apparent authority, Pequiven ratified the agreement months later when it met the first payment deadline and tendered a payment of $2,947,542.00 to Isaac.

Pequiven's argument about lack of consideration also fails. "In a bilateral contract, the exchange of promises by both parties constitutes consideration" whenever "each party must promise to do something which will yield a benefit or advantage to the other, or which will result in a detriment or disadvantage to himself in exchange for the other promise." *Johnson Enters. of Jacksonville, Inc. v. FPL Grp., Inc.*, 162 F.3d 1290, 1311 (11th Cir. 1998) (citation omitted). A promise, "no matter how slight," will "constitute sufficient consideration so long as a party agrees to do something that [it is] not bound to do." *Thompkins v. Lil' Joe Records, Inc.*, 476 F.3d 1294, 1304 n.12 (11th Cir. 2007) (citation and internal quotation marks omitted). Isaac gave up its ability to file "any claim" against Pequiven, which, in exchange for its assumption of the debt, received an extended period for payment. This exchange of promises supplied consideration for the contract.

Pequiven responds that the district court erred when it found that "Pequiven is Bariven's parent company." The district court relied on that finding to conclude that Isaac's "release [of] Bariven from its payment obligations" qualified as a benefit, in part, because of the "very close economic ties between parent and sub." Pequiven maintains that PDVSA, not Pequiven, was Bariven's parent company. And Pequiven relies on its nonparental status to assert that it could not have received a benefit because, until it entered the contract, it had no "repayment period to extend and [Isaac] had no claims against Pequiven to release."

We reject these arguments. Pequiven clearly had some relationship to Bariven and some role in the original transaction: each invoice listed Pequiven as a consignee. In addition, the agreement between Pequiven and Isaac referenced another "payment contract with subrogation of debt signed between Bariven[,] S.A., PDVSA Services B.V., Pequiven, and ISAAC INDUSTRIES INC." Pequiven had some obligation and received a benefit from the extended deadline. To be sure, as the district court explained, "this evidence might wither in the face of a rigorous cross examination, or the production of contrary evidence, [but] that is not the procedural posture of this case." Without evidence of its own, Pequiven cannot create a material dispute of fact about consideration through conjecture.

### D. Summary Judgment for Isaac Industries Was Proper as to Bariven.

Bariven, for its part, argues that Isaac's "failure to adduce a signed written contract as required under Florida's statute of frauds prevented [Isaac] from proving the existence of an enforceable contract as to Bariven." Isaac responds that the district court correctly held that the contract was valid because it dealt with "goods which have been received and accepted." Under the statute of frauds, "a contract for the sale of goods for the price of $500 or more is not enforceable . . . unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought." FLA. STAT. § 672.201(1) (2024). But the statute exempts contracts "[w]ith

respect to goods . . . which have been received and accepted." *Id.*
§ 672.201(3)(c).

The exemption applies here. The district court concluded
that the unsigned invoices—along with Avan's testimony, the
email initiating negotiations over the unpaid debt, the written
terms of Pequiven and Isaac's agreement, and the partial payment
from Pequiven—supported the "find[ing] that Bariven agreed to
purchase the chemicals, that it received and accepted the ship-
ments, and that it failed to pay for them." We agree.

Bariven's attempts to conjure up disputed issues of material
fact fail. It complains that the emails and contract between Isaac
and Pequiven do not "reflect Bariven's assent to a contract." But
Bariven does not dispute that the unrebutted evidence established
that it received and accepted the 2-Ethylhexanol. It also faults the
district court for "relying on the partial payment from Bariven's
parent" when Bariven was a wholly owned subsidiary of PDVSA,
not Pequiven. But, as discussed above, that error does not merit
reversal or undermine the judgment in favor of Isaac.

### E. The District Court Did Not Abuse Its Discretion When It Denied the Oil Companies' Rule 56(d) Motion.

The oil companies argue that the district court abused its
discretion when it refused to deny or defer ruling on Isaac's mo-
tion, under Rule 56(d), "until such time that the crisis [in Vene-
zuela] and its effect on [the oil companies'] access to discovery were
resolved." The district court did nothing of the sort. A party

seeking relief under Rule 56(d) must support its request with an affidavit or declaration that "specifically demonstrate[s] how postponement of a ruling on the motion will enable [it], by discovery or other means, to rebut the movant's showing of the absence of a genuine issue of fact." *Burns*, 999 F.3d at 1334 (citation and internal quotation marks omitted). The oil companies failed to make this showing. As the district court explained, they "declined to depose Isaac's witness or otherwise proactively participate in the discovery process." They also failed to "identify a single piece of documentary or testimonial evidence that they believe might actually controvert Isaac's showing or help their case." Because "vague assertions that additional discovery will produce needed, but unspecified facts" do not satisfy Rule 56(d), *id.* (citation and internal quotation marks omitted), the district court did not abuse its discretion when it declined to defer or delay granting summary judgment.

## IV. CONCLUSION

We **AFFIRM** the judgments in favor of Isaac.